# Exhibit A

Fulton County Superior Court
***EFILED***LW
Date: 4/23/2020 1:35 PM
Cathelene Robinson, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

**136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303**

## SUMMONS

GREENLIGHT FINANCIAL
TECHNOLOGY, INC.

) Case
) No.:_____ **2020CV335487**_____
)
)
**Plaintiff,** )
)
**vs.** )
NADIA ASOYAN )
)
)
)
**Defendant** )
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://efilega.tylerhost.net/ofsweb and serve upon plaintiff's attorney, whose name and address is:

Jeffrey L. Mapen, Esq.
Jessica R. Watson, Esq.
Nelson Mullins Riley & Scarborough, LLP
201 17th St./17th Floor
Atlanta, GA 30363

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This ___**4/23/2020**_____ day of _____, 20 _____

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By _____
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

_____
Deputy Sherriff

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used

## General Civil and Domestic Relations Case Filing Information Form

☑ **Superor** or ☐ **State Court of** Fulton _____ **County**

| For Clerk Use Only | | |
|---|---|---|
| **Date Filed** 4/23/2020 | **Case Number** | 2020CV335487 |
| MM-DD-YYYY | | |

**Plaintiff(s)**

| | | | | |
|---|---|---|---|---|
| Greenlight | Financial | Technology, | Inc. | |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**

| | | | | |
|---|---|---|---|---|
| Asoyan | Nadia | | | |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Jeffrey L. Mapen   **State Bar Number** 469936   **Self-Represented** ☐

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☑ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____ **Case Number**   _____ **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| GREENLIGHT FINANCIAL TECHNOLOGY, INC. | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. __2020CV335487__ |
| v. | ) ) | JURY TRIAL DEMANDED |
| NADIA ASOYAN | ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

Greenlight Financial Technology, Inc., by and through its undersigned counsel, hereby files this Complaint against Nadia Asoyan, alleging as follows:

### PARTIES

1.     Plaintiff, Greenlight Financial Technology, Inc. ("Greenlight") is a Delaware corporation with its principal place of business in Georgia.

2.     Defendant Nadia Asoyan ("Asoyan") is an individual residing in the state of California at 108 Livorno Way, Redwood City, CA 94065.

### JURISDICTION AND VENUE

3.     This is an action for violations of the Delaware Uniform Trade Secrets Act, and for breach of that certain Mutual Non-Disclosure Agreement dated December 18, 2019 by and between Greenlight and Asoyan, attached hereto as Exhibit A (the "Non-Disclosure Agreement").

4.     Subject matter jurisdiction in this Court is proper.

5.     Pursuant to Paragraph 11 of the Non-Disclosure Agreement, this Court has personal jurisdiction over Asoyan, as Asoyan entered into the Non-Disclosure Agreement with Greenlight

in the state of Georgia, traveled to Georgia for negotiations for a position with Greenlight on two occasions, and expressly consented to personal jurisdiction of all state courts located in the State of Georgia and city of Atlanta in the Non-Disclosure Agreement.  Ex. A, Non-Disclosure Agreement, ¶ 11.

6.     Pursuant to Paragraph 11 of the Non-Disclosure Agreement, venue in this Court is proper, as Asoyan and Greenlight agreed to venue in all state courts located in the State of Georgia and city of Atlanta, and expressly waived any objection based on improper venue or *forum non conveniens*.  Ex. A, Non-Disclosure Agreement, ¶ 11.

## GENERAL ALLEGATIONS

7.     Greenlight is an innovative financial technology company located in Atlanta, Georgia that has built its business around a smart debit card and mobile application that is marketed to families for the purpose of allowing parents to manage their children's spending and saving and teaching financial responsibility to children.

8.     Among other things, Greenlight's technology allows parents to transfer funds to a debit card for their child through the mobile application and allows parents to choose the exact stores where their children can spend, manage children's chores and allowances, set parent-paid interest rates on savings, and more.  Kids can track balances, watch their savings grow, gain financial knowledge, and learn to make real world financial decisions.

9.     Because of its unique and proprietary technology, Greenlight has experienced enormous success in the industry, and is the most successful product of its kind currently on the market.

10.     In or around December 2019, Greenlight began searching for candidates to serve as the Chief Financial Officer ("CFO") of Greenlight through a recruiting agency, Daversa Group ("Daversa").

11.     On December 10, 2019, Tim Sheehan, Chief Executive Officer of Greenlight, received an email from Mitch Clay of Daversa proposing Asoyan as a potential candidate for the CFO position.

12.     Asoyan was a resident of California but had expressed a willingness to relocate to Georgia.

13.     Sheehan and Asoyan had a telephone interview regarding the CFO position at Greenlight on or about December 13, 2019.

14.     During the telephone interview, Sheehan only shared with Asoyan high-level, publicly available information about Greenlight's business.

15.     Sheehan was impressed by Asoyan during the interview and Greenlight began aggressively pursuing Asoyan for the position.  Greenlight asked Asoyan to travel to Atlanta for an in-person interview.

16.     Asoyan expressed great interest in the position and agreed to travel to Atlanta for an interview on December 18, 2019.

17.     On December 18, 2019, Asoyan visited Greenlight's office and met with Greenlight's entire executive team.

18.     At the beginning of the December 18, 2019 meeting, and prior to discussing any non-public, confidential and/or proprietary information regarding Greenlight's business, Greenlight provided Asoyan with a Non-Disclosure Agreement for review and execution.  *See* Exhibit A, Non-Disclosure Agreement. Asoyan executed the Non-Disclosure Agreement before any further substantive discussions were held at such meeting.

19.     Pursuant to the Non-Disclosure Agreement, the parties agreed, amongst other things, to "protect and safeguard the confidentiality of all Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information,

but in no event less than a commercially reasonable degree of care".  Exhibit A, Non-Disclosure Agreement, ¶ 2(a).

20.     The parties additionally agreed to "not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose or any related transactions between the Parties, or otherwise in any manner to the Disclosing Party's detriment" and to "not disclose any such Confidential Information to any person or entity". Exhibit A, Non-Disclosure Agreement, ¶ 2(b)-(c).

21.     After Asoyan's execution of the Non-Disclosure Agreement, Asoyan and members of the executive team of Greenlight met for an entire day, and as part of their discussions, Greenlight disclosed confidential and proprietary business information to Asoyan, including trade secret information pertinent to the CFO role, largely in response to direct and detailed questions from Asoyan and in furtherance of her expressed desire to obtain the CFO position at Greenlight. All of the information disclosed to Asoyan at the December 18, 2019 meeting fell squarely within the definition of "Confidential Information" in the Non-Disclosure Agreement.

22.     For example, Greenlight shared strategies and information regarding customer acquisition methods and costs (including the most effective and efficient messages, media, channels and audiences for customer acquisition), Greenlight's unique and proprietary marketing plans and strategy, marketing efficiency broken down by channel, revenue, cost of revenues, lifetime value calculations, churn, detailed financials and key metrics, registration funnel and conversion details, product roadmap and strategy, competitive comparisons, credit facility terms, fundraising timelines, various contract terms, pipelines for partnerships with banks, financial institutions and retailers, card network incentives, custom card revenue details, and results of customer and consumer surveys (the "Proprietary Information").

23.    Particularly with respect to Greenlight's unique and proprietary marketing plans, strategies, messages, media, and channels, Greenlight spent over five years and a great deal of financial resources developing and testing the most effective strategies, all of which were shared with Asoyan at the meeting.

24.    During the December 18, 2019 meeting, Asoyan expressed that she wanted the Greenlight CFO position, with the sole likely contingency that her husband first needed to secure a job in Atlanta.

25.    Although Greenlight interviewed other individuals for the CFO position during this timeframe, and despite the fact that Greenlight acquired executed non-disclosure agreements from the few candidates that it significantly pursued beyond initial meetings, Greenlight did not share the same level of confidential business information or trade secret information with the other candidates as it did with Asoyan in light of the parties' high level of mutual interest.

26.    Although Greenlight was aware that Asoyan was interviewing with other companies, Greenlight was not aware that Asoyan was interviewing with any actual or potential competitors of Greenlight.

27.    After Asoyan returned to California, Sheehan touched base with Asoyan during the December 2019 holiday season.  Asoyan again stated to Sheehan that she wanted the Greenlight CFO position and planned to turn down any other offer from any other company.

28.    Sheehan and Asoyan negotiated employment terms, and following the completion of such negotiations, Sheehan emailed an offer letter to Asoyan, which was executed by Greenlight on January 15, 2020.

29.    After sending the offer letter to Asoyan, Sheehan and Asoyan had another call during which Asoyan told Sheehan that she wanted to come back for a second visit to Atlanta with

her husband to meet with a real estate agent and to hold additional discussions with the Greenlight team.

30.     On February 7, 2020, Asoyan and her husband visited Atlanta.  Asoyan and her husband met with a real estate agent in the morning and Asoyan spent lunch and the afternoon with the Greenlight executive team, including, but not limited to, Sheehan, Johnson Cook (President), Ashley Bachar (Finance Controller), and Jason Goolsby (Director, FP&A, Finance).

31.     During the February 7, 2020 meeting, Greenlight also shared and discussed confidential, proprietary and trade secret information with Asoyan, including the Proprietary Information, in response to Asoyan's detailed questions and in furtherance of her expressed desire to accept the CFO position.

32.     Asoyan indicated that she wanted to wait until her husband found a satisfactory position in Atlanta before she formally accepted the CFO position.

33.     Daversa and members of the Greenlight executive team tried to help Asoyan's husband find a position in Atlanta.

34.     As time passed, however, communications with Asoyan became less frequent and Greenlight was forced to begin looking for other candidates to fill the CFO position.

35.     On March 18, 2020, Asoyan emailed Sheehan, telling Sheehan that her husband had not been able to find a position in Atlanta, and that they would have to stay in the Bay area.

36.     Subsequently, on or about April 15, 2020, Greenlight learned via LinkedIn that Asoyan accepted a position as the Chief Financial Officer of a company called Step, an early-stage financial technology company that is a direct competitor of Greenlight.

37.     Upon information and belief, Asoyan is disclosing and/or will inevitably disclose and use Greenlight's confidential and proprietary business information and trade secret information during the course of her employment at Step.

6

38.     All conditions precedent to bringing this lawsuit have occurred or have been waived.

## COUNT I – BREACH OF NON-DISCLOSURE AGREEMENT

39.     Greenlight hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

40.     The Non-Disclosure Agreement constitutes a valid and enforceable contract between Greenlight and Asoyan, which by its terms is governed by the laws of Delaware.

41.     Greenlight performed all contractual obligations under the Non-Disclosure Agreement.

42.     Upon information and belief, Asoyan materially breached the Non-Disclosure Agreement by using, disclosing and misappropriating Greenlight's confidential and proprietary business information and trade secret information during the process of interviewing for and acquiring her position as CFO at Step, Greenlight's direct competitor, and in her current role as CFO at Step.

43.     As a direct and proximate result of Asoyan's breaches, Greenlight has suffered and will continue to suffer damages in an amount to be determined at trial.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS UNDER
## DELAWARE UNIFORM TRADE SECRETS ACT

44.     Greenlight incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

7

45.     Asoyan acquired knowledge of Greenlight's confidential and proprietary trade secret information.  Such trade secrets include, but are not limited to, Greenlight's customer acquisition methods and costs (including the most effective and efficient messages, media, channels and audiences for customer acquisition),  Greenlight's unique and proprietary marketing plans and strategy, marketing efficiency broken down by channel, revenue, cost of revenues, lifetime value calculations, churn, detailed financials and key metrics, registration funnel and conversion details, product roadmap and strategy, competitive comparisons, credit facility terms, fundraising timelines, various contract terms, pipelines for partnerships with banks, financial institutions and retailers, card network incentives, custom card revenue details, and results of customer and consumer surveys (the "Proprietary Information").

46.     Greenlight takes reasonable measures to keep the Greenlight Proprietary Information secret by storing such information on a secure, password-protected computer network, and by making them available only to key employees such as executives and employees with a direct need-to-know regarding such information.

47.     Greenlight requires individuals who become privy to Greenlight's Proprietary Information to first sign a non-disclosure agreement prior to any disclosure of non-public information, and additionally requires employees to execute non-disclosure agreements, confidentiality agreements, and for certain senior executives, restrictive covenant agreements.

48.     Asoyan acquired knowledge of Greenlight's trade secrets under circumstances giving rise to a duty to maintain its secrecy or limit its use, as set forth in the Non-Disclosure Agreement executed by Asoyan on December 18, 2019.

49.     Asoyan is disclosing and/or will inevitably disclose and use Greenlight's trade secret information to her new employer, Step, a direct competitor of Greenlight.

50.     Such disclosure is without the express or implied consent of Greenlight.

8

51.     As a direct and proximate result of Asoyan's misappropriation, Greenlight has suffered and will continue to suffer damages in an amount to be determined at trial.

### COUNT III – PRELIMINARY AND PERMANENT INJUNCTION

52.     Greenlight hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

53.     Greenlight has a substantial likelihood of success on the merits of its breach of contract and misappropriation of trade secrets claim, and will subsequently demonstrate actual success on the merits.

54.     Greenlight will suffer irreparable injury should an injunction fail to issue that prohibits Asoyan from using, disclosing and misappropriating Greenlight's confidential and proprietary business information and trade secret information, and which prohibits Asoyan from working for Step, Greenlight's direct competitor, or any other direct competitors of Greenlight in the parent and child sector of the fintech industry that is a provider of parent-controlled payment cards for kids and teens.

55.     The threatened injury to Greenlight outweighs any damage that the proposed injunction may cause Asoyan.

56.     The requested injunctive relief will not be adverse to the public interest.

### COUNT IV – ATTORNEY'S FEES

57.     Greenlight hereby incorporates by reference, as if fully set forth herein, each and every allegation asserted in the preceding and following paragraphs, including each and every factual and legal allegation hereinbefore and hereinafter alleged, and hereby re-adopts and re-alleges each such allegation.

58.     Defendant willfully and maliciously misappropriated Greenlight's trade secret information, making an award of attorney's fees justified pursuant to 6 Del. C. § 2004.

## **PRAYER FOR RELIEF**

WHEREFORE, Greenlight requests that judgment be made and entered in its favor and against Asoyan as follows:

A.     Judgment in favor of Greenlight and against Asoyan on all of Greenlight's claims;

B.     An interlocutory injunction pending final adjudication of this matter and subsequent permanent injunction preventing Asoyan from using, disclosing and misappropriating Greenlight's confidential and proprietary business information and trade secret information in accordance with the Non-Disclosure Agreement and other legal and equitable obligations, and which prohibits Asoyan from working for Step, Greenlight's direct competitor, or any other direct competitor of Greenlight in the parent and child sector of the fintech industry that is a provider of parent-controlled payment cards for kids and teens;

C.     An award of Greenlight's costs, expenses, and attorney's fees incurred in connection with bringing and maintaining this action, to the extent permitted by law and equity;

D.     Trial by jury for all claims so triable;

E.     Such further relief as the Court deems appropriate.

Respectfully submitted this 23rd day of April, 2020.

*/s/ Jeffrey L. Mapen*
Jeffrey L. Mapen
Georgia Bar No. 469936
E-mail:  jeff.mapen@nelsonmullins.com
Jessica R. Watson
Georgia Bar No. 760076
E-mail: jessica.watson@nelsonmullins.com
*Attorneys for Plaintiff Greenlight Financial Technology, Inc.*

10

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

# EXHIBIT A

## MUTUAL NON-DISCLOSURE AGREEMENT

**THIS MUTUAL NON-DISCLOSURE AGREEMENT** (the "*Agreement*") effective as of December 18, 2019 (the "*Effective Date*") is entered into between Greenlight Financial Technology, Inc., a Delaware corporation and Nadia Asoyan, an individual (each a "*Party*" and collectively the "*Parties*").

**WHEREAS,** in connection with exploring a potential business relationship (the "*Purpose*"), the Parties desire to share certain information that is non-public, confidential, or proprietary in nature.

**NOW, THEREFORE,** in consideration of the mutual covenants, terms, and conditions set forth herein, the Parties agree as follows:

**1.**     As used herein, the "*Confidential Information*" of a Party means any and all technical and non-technical information disclosed by such Party (the "*Disclosing Party*") to the other Party (the "*Receiving Party*") or its affiliates, or to any of such Receiving Party's or its affiliates' employees, officers, directors, partners, shareholders, agents, attorneys, accountants, or advisors (collectively, "*Representatives*"), whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked, designated, or otherwise identified as "confidential," which may include without limitation:

**(a)**     all information concerning the Disclosing Party's and its affiliates' and their customers', suppliers', and other third parties' past, present and future business affairs, including, without limitation, trade secrets, finances, customer information, supplier information, products, services, organizational structure, internal practices, forecasts, sales and other financial results, records, and budgets, and business, marketing, development, sales, and other commercial strategies;

**(b)**     the Disclosing Party's unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications, and other confidential intellectual property;

**(c)**     all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing;

**(d)**     any third-party confidential information included with, or incorporated in, any information provided by the Disclosing Party to the Receiving Party or its Representatives; and

**(e)**     all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials prepared by or for the Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing.

1.

**2.**     Subject to Section 3, each Party agrees that at all times and notwithstanding any termination or expiration of this Agreement it will:

   **(a)**     protect and safeguard the confidentiality of all Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

   **(b)**     not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose or any related transactions between the Parties, or otherwise in any manner to the Disclosing Party's detriment, including, without limitation, to reverse engineer, disassemble, decompile, or design around the Disclosing Party's proprietary services, products, and/or confidential intellectual property;

   **(c)**     not disclose any such Confidential Information to any person or entity, except to the Receiving Party's Representatives who:

      **(i)**     need to know the Confidential Information to assist the Receiving Party, or act on its behalf, in relation to the Purpose or to exercise its rights under the Agreement;

      **(ii)**     are informed by the Receiving Party of the confidential nature of the Confidential Information; and

      **(iii)**     have signed confidentiality agreements or are otherwise bound by confidentiality duties or obligations to the Receiving Party at least as restrictive as the terms and conditions of this Agreement; and

   **(d)**     be responsible for any breach of this Agreement caused by any of its Representatives;

**3.**     A Receiving Party shall not have any obligations under this Agreement with respect to a specific portion of the Confidential Information of the Disclosing Party if such Receiving Party can demonstrate with competent evidence that such Confidential Information:

   **(a)**     was in the public domain at the time it was disclosed to the Receiving Party;

   **(b)**     entered the public domain subsequent to the time it was disclosed to the Receiving Party, through no fault of the Receiving Party;

   **(c)**     was in the Receiving Party's possession free of any obligation of confidence at the time it was disclosed to Receiving Party;

   **(d)**     was rightfully communicated to the Receiving Party free of any obligation of confidence subsequent to the time it was disclosed to the Receiving Party; or

(e)    it was developed by employees or agents of the Receiving Party independently of and without reference to any information communicated to the Receiving Party by the other party; or

(f)    it was communicated by the Disclosing Party to an unaffiliated third party free of any obligation of confidence.

4.    Except as required by applicable federal, state, or local law or regulation, or as otherwise mutually agreed in writing by the Parties, neither Party shall itself disclose, nor permit any of its Representatives to disclose to any person:

(a)    that the Confidential Information has been made available to it or its Representatives, or that it has inspected any portion of the Confidential Information;

(b)    that discussions or negotiations may be, or are, underway between the Parties regarding the Confidential Information or the Purpose, including the status thereof; or

(c)    any terms, conditions, or other arrangements that are being discussed or negotiated in relation to the Confidential Information or the Purpose.

5.    Notwithstanding the above, a Receiving Party may disclose certain Confidential Information of the Disclosing Party, without violating the obligations of this Agreement, to the extent the disclosure is required by an applicable federal, state, or local law, or a valid order issued by a court or other governmental body having jurisdiction (a "*Legal Order*"), *provided* that the Receiving Party provides the Disclosing Party with prompt written notice of such requirement to enable the Disclosing Party to seek a protective order or other remedy and makes a reasonable effort to obtain, or to assist the Disclosing Party in obtaining, at the Disclosing Party's sole cost and expense, a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation required, or for which the order was issued.  If, after providing such notice and assistance as required herein, the Receiving Party remains subject to a Legal Order to disclose any Confidential Information, the Receiving Party (or its Representatives or other persons to whom such Legal Order is directed) shall disclose no more than that portion of the Confidential Information which, on the advice of the Receiving Party's legal counsel, such Legal Order specifically requires the Receiving Party to disclose and, upon the Disclosing Party's request, shall use commercially reasonable efforts to obtain assurances from the applicable court or agency that such Confidential Information will be afforded confidential treatment.

6.    The Receiving Party shall immediately notify the Disclosing Party upon discovery of any loss or unauthorized disclosure of the Confidential Information of the Disclosing Party.

7.    Upon termination or expiration of the Agreement, or upon written request of the other Party, each Party shall promptly return to the other or destroy (and certify in writing the destruction of) all documents and other tangible materials representing the other

Party's Confidential Information and all copies thereof, whether in written, electronic, or other form or media.

8.      Each Party recognizes and agrees that nothing contained in this Agreement shall be construed as granting any property rights, by license or otherwise, to any Confidential Information of the other Party, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on such Confidential Information.  Neither Party shall make, have made, use, or sell for any purpose any product or other item using, incorporating, or derived from any Confidential Information of the other Party.

9.      Each Party shall not reproduce the Confidential Information of the other Party in any form except as required to accomplish the intent of this Agreement.    Any reproduction by a Party of any Confidential Information of the other Party shall remain the property of the Disclosing Party and shall contain any and all confidential or proprietary notices or legends which appear on the original, unless otherwise authorized in writing by the other Party.

10.     This Agreement shall commence on the Effective Date and shall continue for a period of five (5) years following the Effective Date; provided, however, that each Party's obligations hereunder with respect to Confidential Information that constitutes "Trade Secrets" shall continue in full force and effect for so long as such information remains "Trade Secrets" under applicable law.

11.     This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to conflict of laws principles.  Any legal suit, action, or proceeding arising out of or related to this Agreement or the matters contemplated hereunder shall be instituted exclusively in the state courts and federal courts located in State of Georgia and city of Atlanta, and the parties hereby consent to the personal jurisdiction and venue of these courts and waive any objection based on improper venue or *forum non conveniens*.  Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court.

12.     Each Party acknowledges that its breach of the Agreement may cause irreparable damage to the other Party and that money damages might not be a sufficient remedy for any breach or threatened breach of this Agreement by such Party or its Representatives. Therefore, in addition to all other remedies available at law (which neither Party waives by the exercise of any rights hereunder), each Party shall be entitled to seek specific performance and injunctive and other equitable relief as a remedy for any breach or threatened breach of this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction, and the Parties hereby waive any requirement for the securing or posting of any bond or the showing of actual monetary damages in connection with such claim.

**13.**   If any provision of this Agreement is found by a proper authority to be unenforceable or invalid, such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole and in such event, such provision shall be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or applicable court decisions.

**14.**   Neither Party shall communicate any information to the other in violation of the proprietary rights of any third party.

**15.**   Neither Party will assign or transfer any rights or obligations under this Agreement without the prior written consent of the other Party, *except that* a Party may assign the Agreement without such consent to its successor in interest by way of merger, acquisition, or sale of all or substantially all of its assets.  Any purported assignment or delegation in violation of this Section shall be null and void.  No assignment or delegation shall relieve the assigning or delegating Party of any of its obligations hereunder.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**16.**   Neither party shall export, directly or indirectly, any technical data acquired from the other pursuant to this Agreement or any product utilizing any such data to any country for which the U.S. Government or any agency thereof at the time of export requires an export license or other governmental approval without first obtaining such license or approval.

**17.**   All notices, reports, requests, consents, claims, demands, waivers, and other communications permitted or required under this Agreement shall be in writing and shall be delivered by personal delivery, electronic mail, or by certified or registered mail, return receipt requested, and shall be deemed given upon personal delivery (with written confirmation of receipt), when received by the addressee if sent by a nationally recognized overnight courier (return receipt requested), on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, or on the date sent by e-mail (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient.  Notices shall be sent to the addresses set forth at the end of this Agreement or such other address as either party may specify in writing.

**18.**   This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.  This Agreement may not be amended except by a writing signed by both parties hereto.

**19.**   This Agreement may be executed by electronic signature and in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement.  A signed copy of this Agreement delivered by e-mail or other

means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

20.    No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

*(Signatures follow.)*

**IN WITNESS WHEREOF,** the parties hereto have caused this Mutual Non-Disclosure Agreement to be executed as of the Effective Date.

**GREENLIGHT FINANCIAL TECHNOLOGY, INC.**     **NADIA ASOYAN**

By: _____        By: _____

Name: BEN SWARTWOUT

Title: DIRECTOR, PEOPLE OPERATIONS         Date: _12/18/19_____

Date: _12/18/19_____

Address: 303 Peachtree Street, NE, Suite 4300         Address: _108 Livorno Way, Redwood_
         Atlanta, GA 30308                                      _City CA 94065_

Fulton County Superior Court
***EFILED***LW
Date: 4/23/2020 1:35 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| GREENLIGHT FINANCIAL TECHNOLOGY, INC. | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. __**2020CV335487**__ |
| v. | ) ) | JURY TRIAL DEMANDED |
| NADIA ASOYAN | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

Pursuant to O.C.G.A. § 9-11-65, Plaintiff Greenlight Financial Technology, Inc. ("Greenlight") files this Motion for Preliminary Injunction against Defendant Nadia Asoyan ("Defendant" or "Asoyan") to prevent irreparable harm and preserve the status quo pending the litigation of this action.

## INTRODUCTION

Greenlight seeks to enjoin Defendant from using Greenlight's confidential and proprietary business and trade secret information in her new role working for a direct competitor of Greenlight. Defendant obtained confidential and proprietary business and trade secret information from Greenlight during her interviews (and near acceptance) to become Greenlight's next CFO, all of which information was shared by Greenlight subject to a binding non-disclosure agreement. Yet, in direct violation of that agreement and applicable law, Defendant is using and/or will inevitably use Greenlight's confidential and proprietary information without permission in her new role as chief financial officer of a direct competitor to Greenlight, irreparably harming Greenlight. For these reasons, Greenlight respectfully seeks a preliminary injunction against Defendant.

## **STATEMENT OF FACTS**

Greenlight is an innovative financial technology company located in Atlanta, Georgia, co-founded by Tim Sheehan, Chief Executive Officer, and Johnson Cook, President, that has built its business around a smart debit card and mobile application that is marketed to families for the purpose of allowing parents to manage their children's spending and saving and teaching financial responsibility to children.   (*See* Exhibit A, Sheehan Affidavit, ¶ 2).   Among other things, Greenlight's technology allows parents to transfer funds to a debit card for their child through the mobile application and allows parents to choose the exact stores where their children can spend, manage their children's chores and allowances, set parent-paid interest rates on savings, and more. (Sheehan Aff., ¶ 2).   Using Greenlight, kids can track their balances, watch their savings grow, gain financial knowledge and learn to make real world financial decisions.   (Sheehan Aff., ¶ 2). Because of its unique and proprietary technology, Greenlight has experienced enormous success in the industry, and is the most successful product of its kind currently on the market.   (Sheehan Aff., ¶ 2).

In or around December 2019, Greenlight began searching for candidates to serve as the Chief Financial Officer ("CFO") of Greenlight through a recruiting agency, Daversa Partners ("Daversa").   (Sheehan Aff., ¶ 3).   On December 10, 2019, Tim Sheehan received an email from Mitch Clay of Daversa proposing Asoyan as a potential candidate for the CFO position.   (Sheehan Aff., ¶ 4).

Sheehan and Asoyan had a telephone interview regarding the CFO position at Greenlight on or about December 13, 2019.   (Sheehan Aff., ¶ 5).   During the telephone interview, Sheehan only shared with Asoyan high-level, publicly available information about Greenlight's business. (Sheehan Aff., ¶ 6).   Sheehan was impressed by Asoyan during the interview and Greenlight began

aggressively pursuing Asoyan for the position.  (Sheehan Aff., ¶ 7).  Greenlight asked Asoyan to travel to Atlanta for an in-person interview.  (Sheehan Aff., ¶ 8).  Asoyan expressed great interest in the position and agreed to travel to Atlanta for an interview to take place on December 18, 2019. (Sheehan Aff., ¶ 9).

On December 18, 2019, Asoyan visited Greenlight's office and met with Greenlight's entire executive team.  (Sheehan Aff., ¶ 10).  At the beginning of the December 18, 2019 meeting, and prior to discussing any non-public, confidential and/or proprietary information regarding Greenlight's business, Greenlight provided Asoyan with a Non-Disclosure Agreement for review and execution.  Asoyan executed the Non-Disclosure Agreement before any further substantive discussions were held at such meeting.  (Sheehan Aff., ¶ 11).

Pursuant to the Non-Disclosure Agreement, the parties agreed, amongst other things, to "protect and safeguard the confidentiality of all Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event less than a commercially reasonable degree of care".  (Sheehan Aff., ¶ 12).  The parties additionally agreed to "not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose or any related transactions between the Parties, or otherwise in any manner to the Disclosing Party's detriment" and to "not disclose any such Confidential Information to any person or entity".   (Sheehan Aff., ¶ 13).

After Asoyan's execution of the Non-Disclosure Agreement, Asoyan and members of the executive team of Greenlight met for an entire day, and as part of their discussions, Greenlight disclosed confidential and proprietary business information to Asoyan, including trade secret information pertinent to the CFO role, largely in response to direct questions from Asoyan and in furtherance of her expressed desire to obtain the CFO position at Greenlight.  (Sheehan Aff., ¶ 14).

All of the information disclosed to Asoyan at the December 18, 2019 meeting fell squarely within the definition of "Confidential Information" in the Non-Disclosure Agreement.   (Sheehan Aff., ¶ 14).

For example,   Greenlight shared strategies and information regarding Greenlight's customer acquisition methods and costs, (including the most effective and efficient messages, media, channels and audiences for customer acquisition), Greenlight's unique and proprietary marketing plans and strategy, marketing efficiency broken down by channel, revenue, cost of revenues, lifetime value calculations, churn, detailed financials and key metrics, registration funnel and conversion details, product roadmap and strategy, competitive comparisons, credit facility terms, fundraising timelines, various contract terms, pipelines for partnerships with banks, financial institutions and retailers, card network incentives, custom card revenue details, and results of customer and consumer surveys (the "Proprietary Information").  (Sheehan Aff., ¶ 15). Particularly with respect to Greenlight's unique and proprietary marketing plans, strategies, messages, media, and channels, Greenlight spent over five years and a great deal of financial resources developing and testing the most effective strategies, all of which were shared with Asoyan at the meeting.  (Sheehan Aff., ¶ 16).  During the meeting, Asoyan expressed to Sheehan that she wanted the CFO position, with the sole likely contingency that her husband first needed to secure a job in Atlanta.  (Sheehan Aff., ¶ 17).

Although Greenlight interviewed other individuals for the CFO position during this timeframe, and despite the fact that Greenlight acquired executed non-disclosure agreements from each candidate that it significantly pursued beyond initial meetings, Greenlight did not share the same level of confidential business information or trade secret information with the other candidates as it did with Asoyan in light of the parties' high level of mutual interest.  (Sheehan

Aff., ¶ 18).  Moreover, although Greenlight was aware that Asoyan was interviewing with other companies, Greenlight was not aware that Asoyan was interviewing with any actual or potential competitors of Greenlight.  (Sheehan Aff., ¶ 19).

After Asoyan returned to California, Sheehan touched base with Asoyan during the December 2019 holiday season.  (Sheehan Aff., ¶ 20).  Asoyan again stated to Sheehan that she wanted the Greenlight CFO position and planned to turn down any other offer from any other company.  (Sheehan Aff., ¶ 20).  Sheehan and Asoyan negotiated employment terms, and following the completion of such negotiations, Sheehan emailed an offer letter to Asoyan, which was executed by Greenlight on January 15, 2020.  (Sheehan Aff., ¶ 21).  Sheehan also arranged for telephone calls between Asoyan and various high-level executives and board members at Greenlight to discuss Greenlight's business and the CFO position.  (Sheehan Aff., ¶ 22).

After sending the offer letter to Asoyan, Sheehan and Asoyan had another call during which Asoyan told Sheehan that she wanted to come back for a second visit to Atlanta with her husband to meet with a real estate agent and to hold additional discussions with the Greenlight team.  (Sheehan Aff., ¶ 23).  On February 7, 2020, Asoyan and her husband visited Atlanta. (Sheehan Aff., ¶ 24).  Asoyan and her husband met with a real estate agent in the morning and Asoyan spent lunch and the afternoon with the Greenlight executive team including, but not limited to, Sheehan, Johnson Cook (President), Ashley Bachar (Finance Controller), and Jason Goolsby (Director, FP&A, Finance).  (Sheehan Aff., ¶ 24).  During the February 7, 2020 meeting, Greenlight also shared and discussed confidential, proprietary and trade secret information with Asoyan, including the Proprietary Information, in response to Asoyan's detailed and direct questions about the Proprietary Information and in furtherance of her expressed desire to accept the CFO position.  (Sheehan Aff., ¶ 25).

Asoyan indicated that she wanted to wait until her husband found a satisfactory position in Atlanta before she formally accepted the CFO position.  (Sheehan Aff., ¶ 26).  Daversa and members of the Greenlight executive team tried to help Asoyan's husband find a position in Atlanta.  (Sheehan Aff., ¶ 27).  As time passed, however, communications with Asoyan became less frequent and Greenlight was forced to begin looking for other candidates to fill the CFO position.  (Sheehan Aff., ¶ 28).

On March 18, 2020, Asoyan emailed Sheehan, telling Sheehan that her husband had not been able to find a satisfactory position in Atlanta, and that they would have to stay in the Bay area.  (Sheehan Aff., ¶ 29).  Subsequently, on or about April 15, 2020, Greenlight learned via LinkedIn that Asoyan accepted a position as the Chief Financial Officer of a company called Step, an early-stage financial technology company in the parent and child sector of the fintech industry that directly competes with Greenlight as a provider of parent-controlled payment cards for kids and teens.  (Sheehan Aff., ¶ 30).  Step is self-proclaimed as a "next generation financial services company building the best banking experience to help teens and young adults achieve financial independence and knowledge at an earlier age", and its main product is a credit card for teens that is associated with a mobile banking app.  *See generally* https://www.step.com/faq.

Asoyan gathered substantial trade secret and confidential business information regarding Greenlight and its processes during her interview process after execution of the Non-Disclosure Agreement.  Because Step is a direct competitor of Greenlight with a central focus of providing a product that is substantially similar to Greenlight's product, Greenlight believes that Asoyan is disclosing and/or will inevitably disclose Greenlight's confidential and proprietary business information and trade secret information during the course of her employment at Step.  As such,

Greenlight requests an order enjoining Defendant's unlawful conduct to cease and prevent irreparable harm to Greenlight.

## ARGUMENT

### A.    This Court May Issue a Preliminary Injunction.

Georgia courts are empowered to grant preliminary injunctions. O.C.G.A. § 9-11-65. The decision to grant or deny a request for injunctive relief "rest[s] in the sound discretion of the judge, according to the circumstances of each case." O.C.G.A. § 9-5-8. A trial court may grant a preliminary injunction "to maintain the status quo until a final hearing if, by balancing the relative equities of the parties, it would appear that the equities favor the party seeking the injunction." *Outdoor Advertising Ass'n of Ga., Inc. v. Garden Club of Ga., Inc.*, 272 Ga. 146, 147 (2000); *see also Kinard v. Ryman Farm Homeowners' Ass'n, Inc.*, 278 Ga. 149, 149 (2004) (noting the "purpose for granting interlocutory injunctions is to preserve the status quo as well as balance the conveniences of the parties pending a final adjudication of the case.").

When a trial court considers an application for an interlocutory injunction pending a final judgment, the court should look to these four factors:

> (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

*Green Bull Georgia Partners, LLC v. Register*, 301 Ga. 472, 475, 801 S.E.2d 843, 846 (2017).

The parties' relationship in this case is governed by Delaware law.  (Sheehan Aff., Ex. B, NDA, ¶ 11).   Under Delaware law, courts are entitled to "limit a defendant from working in a particular field if his doing so poses a substantial risk of the inevitable disclosure of trade secrets." *W.L. Gore & Assocs., Inc. v. Wu*, No. CIV.A. 263-N, 2006 WL 2692584, at *17 (Del. Ch. Sept.

15, 2006), aff'd, 918 A.2d 1171 (Del. 2007).  As explained in *W.L. Gore*, if a defendant cannot perform all of her prospective duties for a competitor to the best of her ability without in effect giving the competitor the benefit of the confidential and trade secret information of the aggrieved party, such a scenario "makes a simple injunction against disclosure and use of this information inadequate."  *W.L. Gore*, 2006 WL 2692584, at \*17; *see also Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 114 (3d Cir. 2010) ("the District Court had discretion to enjoin Botticella from working at Hostess to the extent this proposed employment threatened to lead to the misappropriation of these trade secrets.").

**B.**     **Greenlight is Likely to Succeed on the Merits of its Claims.**

Greenlight is substantially likely to succeed on the merits of its claims for trade secret misappropriation because there is a substantial likelihood that Asoyan is disclosing and/or will inevitably disclose and use Greenlight's confidential and proprietary information and trade secrets. Such disclosure is in violation of Asoyan's obligations under the Non-Disclosure Agreement and Delaware trade secret laws.  As a result of Asoyan's actions, Greenlight has suffered and will continue to suffer immediate and irreparable harm to its business.

**1.**     **Plaintiff is Likely to Prevail on Plaintiff's Misappropriation of Trade Secrets Claim under the Delaware Uniform Trade Secrets Act**

The Delaware Uniform Trade Secrets Act ("DUTSA") provides trade secret owners with a remedy for the threatened misappropriation of trade secrets. 6 Del. C. § 2001; § 2002.   As set forth below, Greenlight is likely to succeed on the merits under the DUTSA.

**a.**     **Information disclosed to Asoyan constituted trade secrets under the DUTSA.**

The DUTSA defines trade secrets as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that

8

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. C. § 2001; *see also Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2010 WL 610725, at *17–18 (Del. Ch. Feb. 18, 2010).

Here, largely in response to Asoyan's detailed questions during the interview process and the parties' high level of mutual interest, Greenlight shared with Asoyan confidential and proprietary trade secret information including, but not limited to: customer acquisition methods and costs (including the most effective and efficient messages, media, channels and audiences for customer acquisition), Greenlight's unique and proprietary marketing plans and strategy, marketing efficiency broken down by channel, revenue, cost of revenues, lifetime value calculations, churn, detailed financials and key metrics, registration funnel and conversion details, product roadmap and strategy, competitive comparisons, credit facility terms, fundraising timelines, various contract terms, pipelines for partnerships with banks, financial institutions and retailers, card network incentives, custom card revenue details, and results of customer and consumer surveys (the "Proprietary Information") (Sheehan Aff., ¶ 15).

First, Greenlight's Proprietary Information – all of which is nonpublic – derives economic value from not being generally known or readily ascertainable by proper means.  Greenlight spent over five years and devoted a great deal of resources to developing its marketing, operating and product plans by testing and researching what ultimately worked to reach consumers and to sell its product.  (Sheehan Aff., ¶ 16).  The evidence thus demonstrates "a competitor could not have generated a similar system without expending a comparable amount of time and money." *Beard*

*Research, Inc. v. Kates*, 8 A.3d 573, 594 (Del. Ch.), aff'd sub nom. *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010); *see also Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, No. CIV.A. 3718-VCP, 2010 WL 338219, at *19 (Del. Ch. Jan. 29, 2010) ("In large measure, a trade secret 'derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money.'") (internal citation omitted).  Greenlight's unique and proprietary marketing channels and tactics, as well as its revenue, cost of revenues, detailed financials and key metrics, and contract terms and negotiations, are all core tenets of Greenlight's business which are extremely confidential and closely guarded by Greenlight.  Should Greenlight's competitors acquire this information, they would have unfair bargaining power and anti-competitive insight into Greenlight's business and would be able to essentially recreate Greenlight's business without expending the immense time and effort that Greenlight invested.   (Sheehan Aff., ¶ 33).

Second, Greenlight takes reasonable measures to keep the Greenlight Proprietary Information secret by storing such information on a secure, password-protected computer network, and by making them available only to key employees such as executives and employees with a direct need-to-know regarding such information. (Sheehan Aff., ¶ 31).  Moreover, Greenlight requires individuals who become privy to Greenlight's Proprietary Information to first sign a non-disclosure agreement prior to disclosure of non-public information, and additionally requires employees to execute non-disclosure agreements, confidentiality agreements, and, for certain senior executives, restrictive covenant agreements.  (Sheehan Aff., ¶ 32).  Accordingly, the Greenlight Proprietary Information qualifies as trade secrets under the DUTSA.

**b.    There is a substantial likelihood that Defendant will inevitably disclose and use Greenlight's Proprietary Information.**

The DUTSA defines "misappropriation" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . "

(1) used improper means to acquire knowledge of the trade secret; or

(2) at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was--

(A) derived from or through a person who had utilized improper means to acquire the trade secret;

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

6 Del. C. § 2001.

Under 6 Del. C. § 2002, "actual *or threatened* misappropriation may be enjoined."  6 Del. C. § 2002 (emphasis added).  Thus, an aggrieved party can acquire the benefit of injunctive relief by demonstrating that there is a substantial likelihood of inevitable disclosure of the trade secret. *See, e.g.*, *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 114 (3d Cir. 2010) ("[t]he proper inquiry" in determining whether to grant an injunction to prevent the threatened disclosure of trade secrets is  "whether there is  sufficient  likelihood,  or  substantial  threat"  of a defendant disclosing trade secrets.").

Thus, for example, in *W.L. Gore & Assocs., Inc. v. Wu*, No. CIV.A. 263-N, 2006 WL 2692584 (Del. Ch. Sept. 15, 2006), aff'd, 918 A.2d 1171 (Del. 2007), the court enjoined the defendant from working with a competitor, reasoning that the defendant "could not unlearn" what

11

he learned while working for his former employer, and that "his extensive knowledge would almost certainly filter into his work and result in disclosure of [] trade secrets." W.L. Gore, 2006 WL 2692584 at *14; *see also Doebler's Pennsylvania Hybrids, Inc. v. Doebler Seeds*, LLC, 88 F. App'x 520, 522 (3d Cir. 2004) (affirming issuance of preliminary injunction based on the fact that a company employed former employees in "in positions that will result in inevitable disclosures of trade secrets").

Here, Asoyan acquired the Greenlight Proprietary Information under a duty to maintain its secrecy, after execution of the Non-Disclosure Agreement. (Sheehan Aff. ¶ 11). Furthermore, there is a substantial likelihood that Asoyan will disclose Greenlight's Proprietary Information to Step and use Greenlight's Proprietary Information to Step's advantage. As CFO at Step, and particularly since Step is an early-stage company, Asoyan is going to have responsibility for planning, implementation, managing and running of all the finance activities of a company, including business planning, budgeting, forecasting and negotiations. Her knowledge of Greenlight's Proprietary Information, disclosed to her subject to the Non-Disclosure Agreement, has essentially provided her a roadmap for how to model many of Step's business strategies identically after Greenlight without expending the time and money that Greenlight invested. Indeed, even if Asoyan is forbidden from further disclosing Greenlight's Proprietary Information to Step, it will be nearly impossible for Asoyan not to use such information to Step's benefit by, for example, using her knowledge about Greenlight's marketing strategies and channels to identically model Step's marketing efforts, or using her knowledge about Greenlight's contract terms to negotiate similar or lower prices for Step.

Based on the foregoing, the Greenlight Proprietary Information constitutes trade secrets and there is a substantial likelihood that Defendant will inevitably disclose and use Greenlight's

Proprietary Information during her employment with her new employer, Step, a direct competitor of Greenlight.    Thus, because threatened misappropriation may be enjoined under 6 Del. C. § 2002, and because there is a substantial likelihood that Asoyan will inevitably disclose and use Greenlight's Proprietary Information during the course of her employment at Step, Greenlight seeks immediate injunctive relief preventing Asoyan from working for Step or any other direct competitor of Greenlight in the parent and child sector of the fintech industry that is a provider of parent-controlled payment cards for kids and teens, and preventing Asoyan from using or disclosing misappropriated Proprietary Information from Greenlight.

## C.      Greenlight is Entitled to Injunctive Relief to Prevent Immediate and Irreparable Harm.

As an initial matter, the Non-Disclosure Agreement that Asoyan executed relieves Greenlight of demonstrating this element.  Specifically, under Paragraph 12 of the Non-Disclosure Agreement, the parties expressly acknowledged that breach "of the Agreement may cause irreparable damage to the other Party and that money damages might not be a sufficient remedy for any breach or threatened breach of this Agreement."  (Sheehan Aff., Ex. B, NDA, ¶ 12).  Thus, under the terms of the Non-Disclosure Agreement, the parties acknowledged that "each Party shall be entitled to seek specific performance and injunctive and other equitable relief as a remedy for any breach or threatened breach of this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction, and the Parties hereby waive any requirement for the securing or posting of any bond or the showing of actual monetary damages in connection with such claim." (Sheehan Aff., Ex. B, NDA, ¶ 12); *AM Gen. Holdings LLC v. Renco Grp., Inc.*, No. CIV.A. 7639-VCN, 2012 WL 6681994, at *4 (Del. Ch. Dec. 21, 2012) (noting that Delaware courts have held "that contractual stipulations as to irreparable harm alone suffice to establish that element for the

purpose of issuing preliminary injunctive relief."); *see also UtiliSave, LLC v. Miele*, No. CV 10729-VCP, 2015 WL 5458960, at *11 (Del. Ch. Sept. 17, 2015) (same).

Regardless, Greenlight can easily demonstrate that without immediate injunctive relief, Greenlight will sustain irreparable harm for which there is no adequate remedy at law. Greenlight's technology is a one-of-a-kind product in the financial technology industry and Greenlight has spent countless hours developing its product and business model.  (Sheehan Aff. ¶ 15-16).  Asoyan has gathered sufficient Proprietary Information from Greenlight to essentially re-create Greenlight's business model at Step, a direct competitor of Greenlight in the parent and child sector of the fintech industry, without any of the expenditure, time or effort that Greenlight expended, which is irreparably harmful to Greenlight.  (Sheehan Aff. ¶ 33).  This immediate and irreparable harm justifies injunctive relief in favor of Greenlight.

**D.** **The Balance of Equities Demonstrates that the Threatened Injury to Greenlight Vastly Outweighs the Potential Harm to Defendant.**

The threat of continuing irreparable injury to Greenlight clearly outweighs any speculative harm that injunctive relief might cause Asoyan. Specifically, Asoyan cannot show that undue hardship will result if she is restrained from working for Step and from using non-public information that was misappropriated from Greenlight, which will irreparably harm Greenlight's business when disclosed to Asoyan's new employer, a direct competitor of Greenlight.

Asoyan's background is in accounting and finance.   Her skills are transferable to serving as a CFO or similar position in any industry, or even within the financial technology industry with an employer that is not a provider of parent-controlled payment cards for kids and teens. Moreover, Asoyan will suffer little harm from an injunction that prevents her from using or disclosing the misappropriated Proprietary Information from Greenlight, or from working in the parent and child sector of the fintech industry with a provider of parent-controlled payment cards

14

for kids and teens.  Greenlight only seeks to prevent Asoyan from working in a very narrow section of the industry, and her skills are transferable to numerous other companies that do not directly compete with Greenlight.  Accordingly, this factor weighs heavily in favor of granting temporary injunctive relief.

**E.**   **Granting Injunctive Relief Would Serve the Public Interest.**

Finally, it is in the public interest to restrain anti-competitive behavior made possible by breach of contractual obligations and theft of trade secret information. There is a recognized general public interest in "upholding the inviolability of trade secrets and enforceability of confidentiality agreements." *Bimbo Bakeries USA, Inc.*, 613 F.3d 102 at 119 (3d Cir. 2010).  A contrary ruling would embolden would-be misappropriators seeking competitive advantage over rival businesses.  *See also Priority Payment Sys., LLC v. Signapay, LTD*, 161 F. Supp. 3d 1294, 1304 (N.D. Ga. 2016) ("There is a strong public policy for protecting trade secrets from misappropriation and in promoting fair competition.").

## CONCLUSION

Greenlight submits that the Court should grant Greenlight's motion for preliminary injunction because (1) Greenlight has a substantial likelihood of success on the merits; (2) failure to enjoin Asoyan's behavior during the pendency of this litigation would result in immediate and irreparable harm to Greenlight's continued business operations; (3) the balance of equities favors injunctive relief; and (4) the public interest cuts in favor of Greenlight's requested relief. Accordingly, Greenlight requests that this Court enter a preliminary injunction preventing Asoyan from working for Step or any other direct competitor of Greenlight in the parent and child sector of the fintech industry that is a provider of parent-controlled payment cards for kids and teens, and

from using or disclosing Greenlight's Proprietary Information or any information derived therefrom, during the pendency of this litigation.

Respectfully submitted this 23rd day of April, 2020.

/s/ Jeffrey L. Mapen
Jeffrey L. Mapen
Georgia Bar No. 469936
E-mail:  jeff.mapen@nelsonmullins.com
Jessica R. Watson
Georgia Bar No. 760076
E-mail: jessica.watson@nelsonmullins.com
*Attorneys for Plaintiff Greenlight Financial Technology, Inc.*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

16

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2020, I served the within and foregoing *Plaintiff's Motion for Preliminary Injunction and Memorandum in Support* by electronic mail and U.S. Mail to the following:

> Nadia Asoyan
> 108 Livorno Way
> Redwood City, CA 94065.
> nadia.asoyan@gmail.com

Respectfully submitted this 23 day of April, 2020.

> */s/ Jeffrey L. Mapen*
> Jeffrey L. Mapen
> Georgia Bar No. 469936
> E-mail:  jeff.mapen@nelsonmullins.com
> Jessica R. Watson
> Georgia Bar No. 760076
> E-mail: jessica.watson@nelsonmullins.com
> *Attorneys for Plaintiff Greenlight Financial Technology, Inc.*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street/ 17th Floor
Atlanta, GA  30363
(404) 322-6000 (phone)
(404) 322-6050 (fax)

Exhibit "A"

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

GREENLIGHT                          )
FINANCIAL TECHNOLOGY, INC.          )
                                    )
    Plaintiff,                      )
                                    )     CASE NO. _____
v.                                  )
                                    )     JURY TRIAL DEMANDED
NADIA ASOYAN                        )
                                    )
    Defendant.                      )
                                    )

_____

**AFFIDAVIT OF TIMOTHY SHEEHAN**

STATE OF GEORGIA                    )
                                    )
COUNTY OF FULTON                    )

NOW COMES, Timothy Sheehan, who after being duly sworn deposes and says as follows:

1.

My name is Timothy Sheehan. I give this affidavit in support of Plaintiff's Motion for Preliminary Injunction and for all other purposes permitted by law. I am over 21, and I reside in the State of Georgia.  I am currently the Chief Executive Officer at Greenlight Financial Technology, Inc.  I testify to the information set forth herein based upon my personal knowledge and upon the attached copies of records of regularly conducted activity.

2.

Greenlight is a financial technology company located in Atlanta, Georgia that has built its business around a smart debit card and mobile application that is marketed to families for the purpose of allowing parents to manage their children's spending and saving and teaching financial

responsibility to children. Among other things, Greenlight's technology allows parents to transfer funds to a debit card for their child through the mobile application and allows parents to choose the exact stores where their children can spend, manage their children's chores and allowances, set parent-paid interest rates on savings, and more. Using Greenlight, kids can track their balances, watch their savings grow, gain financial knowledge, and learn to make real world financial decisions. Because of its unique and proprietary technology, Greenlight has experienced enormous success in the industry, and is the most successful product of its kind currently on the market.

3.

In or around December 2019, Greenlight began searching for candidates to serve as the Chief Financial Officer ("CFO") of Greenlight through a recruiting agency, Daversa Partners ("Daversa").

4.

On December 10, 2019, I received an email from Mitch Clay of Daversa proposing Nadia Asoyan as a potential candidate for the CFO position. *See* Exhibit A, Dec. 10, 2019 Email.

5.

I had a telephone interview with Asoyan regarding the CFO position at Greenlight on or about December 13, 2019.

6.

During the telephone interview, I only shared with Asoyan high-level, publicly available information about Greenlight's business.

7.

I was impressed by Asoyan during the interview and we began aggressively pursuing Asoyan for the CFO position at Greenlight.

8.

I asked Asoyan to travel to Atlanta for an in-person interview with Greenlight's executive team.

9.

Asoyan expressed great interest in the CFO position at Greenlight and agreed to travel to Atlanta for an interview to take place on December 18, 2019.

10.

On December 18, 2019, Asoyan visited Greenlight's office and met with Greenlight's entire executive team.

11.

At the beginning of the December 18, 2019 meeting, and prior to discussing any non-public, confidential and/or proprietary information regarding Greenlight's business, Greenlight provided Asoyan with a Non-Disclosure Agreement for review and execution.  *See* Exhibit B, Non-Disclosure Agreement.  Asoyan executed the Non-Disclosure Agreement before any further substantive discussions were held at such meeting.

12.

Pursuant to the Non-Disclosure Agreement, the parties agreed, amongst other things, to "protect and safeguard the confidentiality of all Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no

event less than a commercially reasonable degree of care".  *See* Exhibit B, Non-Disclosure Agreement, ¶ 2(a).

13.

The parties additionally agreed to "not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose or any related transactions between the Parties, or otherwise in any manner to the Disclosing Party's detriment" and to "not disclose any such Confidential Information to any person or entity". *See* Exhibit B, Non-Disclosure Agreement, ¶ 2(b)-(c).

14.

After Asoyan's execution of the Non-Disclosure Agreement, Asoyan and members of the executive team of Greenlight met for an entire day, and as part of their discussions, Greenlight disclosed confidential and proprietary business information to Asoyan, including trade secret information pertinent to the CFO role, largely in response to direct questions from Asoyan and in furtherance of her expressed desire to obtain the CFO position at Greenlight.  All of the information disclosed to Asoyan at the December 18, 2019 meeting fell squarely within the definition of "Confidential Information" in the Non-Disclosure Agreement.

15.

For example, Greenlight shared strategies and information regarding customer acquisition methods and costs (including the most effective and efficient messages, media, channels and audiences for customer acquisition), Greenlight's unique and proprietary marketing plans and strategy, marketing efficiency broken down by channel, revenue, cost of revenues, lifetime value calculations, churn, detailed financials and key metrics, registration funnel and conversion details, product roadmap and strategy, competitive comparisons, credit facility terms, fundraising

timelines, various contract terms, pipelines for partnerships with banks, financial institutions and retailers, card network incentives, custom card revenue details, and results of customer and consumer surveys (the "Proprietary Information").

16.

Particularly with respect to Greenlight's unique and proprietary marketing plans, strategies, messages, media, and channels, Greenlight spent over five years and a great deal of financial resources developing and testing the most effective strategies, all of which were shared with Asoyan at the meeting.

17.

During the meeting, Asoyan expressed to me that she wanted the CFO position, with the sole likely contingency that her husband first needed to secure a job in Atlanta.

18.

Although Greenlight interviewed other individuals for the CFO position during this timeframe, and despite the fact that Greenlight acquired executed non-disclosure agreements from each candidate that it significantly pursued beyond initial meetings, Greenlight did not share the same level of confidential business information or trade secret information with the other candidates as it did with Asoyan in light of the parties' high level of mutual interest.

19.

Moreover, although Greenlight was aware that Asoyan was interviewing with other companies, Greenlight was not aware that Asoyan was interviewing with any actual or potential competitors of Greenlight.

20.

After Asoyan returned to California, I touched base with Asoyan during the December 2019 holiday season.  During our conversation, Asoyan again stated to me that she wanted the Greenlight CFO position and planned to turn down any other offer from any other company.

21.

I negotiated employment terms with Asoyan, and following the completion of such negotiations, I emailed an offer letter to Asoyan on January 15, 2020, which was already executed by Greenlight.  *See* Exhibit C, January 15, 2020 Email.

22.

I also arranged for phone calls between Asoyan and various high-level executives and board members at Greenlight to discuss Greenlight's business and the CFO position, including with Chris Olsen (Drive Capital founding partner and member of Greenlight's Board of Directors) and Rachel Hamilton (Chief Marketing Officer).

23.

After sending the offer letter to Asoyan, I had another call with Asoyan during which Asoyan told me that she wanted to come back for a second visit to Atlanta with her husband to meet with a real estate agent and to hold additional discussions with the Greenlight team.

24.

On February 7, 2020, Asoyan and her husband visited Atlanta. Asoyan and her husband met with a real estate agent in the morning and Asoyan spent lunch and the afternoon with members of Greenlight executive team, including, but not limited to, myself, Johnson Cook (President), Ashley Bachar (Finance Controller), and Jason Goolsby (Director, FP&A, Finance).

25.

During the February 7, 2020 meeting, Greenlight also shared and discussed confidential, proprietary and trade secret information with Asoyan, including the Proprietary Information, in response to Asoyan's detailed and direct questions about the Proprietary Information and in furtherance of her expressed desire to accept the CFO position.

26.

Asoyan indicated that she wanted to wait until her husband found a satisfactory position in Atlanta before she formally accepted the CFO position.

27.

Daversa and members of the Greenlight executive team tried to help Asoyan's husband find a position in Atlanta.

28.

As time passed, however, communications with Asoyan became less frequent and Greenlight was forced to begin looking for other candidates to fill the CFO position.

29.

On March 18, 2020, Asoyan emailed me to tell me that her husband had not been able to find a satisfactory position in Atlanta, and that they would have to stay in the Bay area. *See* Exhibit D, March 18, 2020 Email.

30.

Subsequently, on or about April 15, 2020, Greenlight learned via LinkedIn that Asoyan accepted a position as the Chief Financial Officer of a company called Step, an early-stage financial technology company in the parent and child sector of the fintech industry that directly competes with Greenlight as a provider of parent-controlled payment cards for kids and teens.

31.

Greenlight takes reasonable measures to keep the Greenlight Proprietary Information secret by storing such information on a secure, password-protected computer network, and by making them available only to key employees such as executives and employees with a direct need-to-know regarding such information.

32.

Greenlight requires individuals who become privy to Greenlight's Proprietary Information to first sign a non-disclosure agreement prior to disclosure of non-public information, and additionally requires employees to execute non-disclosure agreements, confidentiality agreements, and for certain senior executives, restrictive covenant agreements.

33.

Should Greenlight's competitors in the parent and child sector of the fintech industry acquire Greenlight's Proprietary Information, particularly those competitors who are providers of parent-controlled payment cards for kids and teens, Greenlight would suffer irreparable harm. Such competitors would have unfair bargaining power and anti-competitive insight into Greenlight's business and would be able to recreate Greenlight's business without expending the immense time and effort that Greenlight invested in developing Greenlight's Proprietary Information.

FURTHER AFFIANT SAITH NOT.

Timothy Sheehan
Chief Executive Officer
Greenlight Financial Technology, Inc.

_Anita J. Pealor_

Sworn to and subscribed before
me this 22nd day of April, 2020.

Notary Public

# EXHIBIT A



**From:** Tim Sheehan <tim@greenlight.me>
**Subject: Re: Introduction N.Asoyan | T.Sheehan**
**Date:** December 10, 2019 at 10:21:20 PM EST
**To:** "nadia.asoyan@gmail.com" <nadia.asoyan@gmail.com>
**Cc:** Amanda Fischer <amanda@greenlight.me>

Hi Nadia, it's great to meet you! I'm looking forward to chatting and getting to know each other.
Amanda, could you please schedule some time for Nadia and me to chat this week (the sooner the better)?
[moved everyone else to bcc to save their inboxes]


On Dec 10, 2019, at 4:26 PM, Mitch Clay <Mitch.Clay@daversapartners.com> wrote:


Tim,

Please meet Nadia Asoyan, Head of Finance and Strategy at Robinhood. Nadia
was the first finance hire at Robinhood and came into the business after they
raised their series B. Nadia has since built her team to over 20 people and helped
raise over $800M in funding. Nadia is passionate about fintech
that empowers kids and looks forward to learning more about Greenlight.

Nadia,
Please meet Timothy Sheehan, founder of Greenlight. Tim will be able to walk
you through the tremendous vision and business aspirations for the company.

I have cc'd Amanda who can help find time for the two of you to meet.

Best,
Mitch



Mitch Clay
Phone: 616-350-2391

daversa partners

# EXHIBIT B

# MUTUAL NON-DISCLOSURE AGREEMENT

THIS MUTUAL NON-DISCLOSURE AGREEMENT (the "*Agreement*") effective as of December 18, 2019 (the "*Effective Date*") is entered into between Greenlight Financial Technology, Inc., a Delaware corporation and Nadia Asoyan, an individual (each a "*Party*" and collectively the "*Parties*").

WHEREAS, in connection with exploring a potential business relationship (the "*Purpose*"), the Parties desire to share certain information that is non-public, confidential, or proprietary in nature.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, the Parties agree as follows:

1.      As used herein, the "*Confidential Information*" of a Party means any and all technical and non-technical information disclosed by such Party (the "*Disclosing Party*") to the other Party (the "*Receiving Party*") or its affiliates, or to any of such Receiving Party's or its affiliates' employees, officers, directors, partners, shareholders, agents, attorneys, accountants, or advisors (collectively, "*Representatives*"), whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked, designated, or otherwise identified as "confidential," which may include without limitation:

(a)      all information concerning the Disclosing Party's and its affiliates' and their customers', suppliers', and other third parties' past, present and future business affairs, including, without limitation, trade secrets, finances, customer information, supplier information, products, services, organizational structure, internal practices, forecasts, sales and other financial results, records, and budgets, and business, marketing, development, sales, and other commercial strategies;

(b)      the Disclosing Party's unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications, and other confidential intellectual property;

(c)      all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing;

(d)      any third-party confidential information included with, or incorporated in, any information provided by the Disclosing Party to the Receiving Party or its Representatives; and

(e)      all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials prepared by or for the Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing.

2.      Subject to Section 3, each Party agrees that at all times and notwithstanding any termination or expiration of this Agreement it will:

(a)      protect and safeguard the confidentiality of all Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

(b)      not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than the Purpose or any related transactions between the Parties, or otherwise in any manner to the Disclosing Party's detriment, including, without limitation, to reverse engineer, disassemble, decompile, or design around the Disclosing Party's proprietary services, products, and/or confidential intellectual property;

(c)      not disclose any such Confidential Information to any person or entity, except to the Receiving Party's Representatives who:

(i)      need to know the Confidential Information to assist the Receiving Party, or act on its behalf, in relation to the Purpose or to exercise its rights under the Agreement;

(ii)      are informed by the Receiving Party of the confidential nature of the Confidential Information; and

(iii)      have signed confidentiality agreements or are otherwise bound by confidentiality duties or obligations to the Receiving Party at least as restrictive as the terms and conditions of this Agreement; and

(d)      be responsible for any breach of this Agreement caused by any of its Representatives;

3.      A Receiving Party shall not have any obligations under this Agreement with respect to a specific portion of the Confidential Information of the Disclosing Party if such Receiving Party can demonstrate with competent evidence that such Confidential Information:

(a)      was in the public domain at the time it was disclosed to the Receiving Party;

(b)      entered the public domain subsequent to the time it was disclosed to the Receiving Party, through no fault of the Receiving Party;

(c)      was in the Receiving Party's possession free of any obligation of confidence at the time it was disclosed to Receiving Party;

(d)      was rightfully communicated to the Receiving Party free of any obligation of confidence subsequent to the time it was disclosed to the Receiving Party; or

(e)    it was developed by employees or agents of the Receiving Party independently of and without reference to any information communicated to the Receiving Party by the other party; or

(f)    it was communicated by the Disclosing Party to an unaffiliated third party free of any obligation of confidence.

4.    Except as required by applicable federal, state, or local law or regulation, or as otherwise mutually agreed in writing by the Parties, neither Party shall itself disclose, nor permit any of its Representatives to disclose to any person:

(a)    that the Confidential Information has been made available to it or its Representatives, or that it has inspected any portion of the Confidential Information;

(b)    that discussions or negotiations may be, or are, underway between the Parties regarding the Confidential Information or the Purpose, including the status thereof; or

(c)    any terms, conditions, or other arrangements that are being discussed or negotiated in relation to the Confidential Information or the Purpose.

5.    Notwithstanding the above, a Receiving Party may disclose certain Confidential Information of the Disclosing Party, without violating the obligations of this Agreement, to the extent the disclosure is required by an applicable federal, state, or local law, or a valid order issued by a court or other governmental body having jurisdiction (a "*Legal Order*"), *provided* that the Receiving Party provides the Disclosing Party with prompt written notice of such requirement to enable the Disclosing Party to seek a protective order or other remedy and makes a reasonable effort to obtain, or to assist the Disclosing Party in obtaining, at the Disclosing Party's sole cost and expense, a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation required, or for which the order was issued.  If, after providing such notice and assistance as required herein, the Receiving Party remains subject to a Legal Order to disclose any Confidential Information, the Receiving Party (or its Representatives or other persons to whom such Legal Order is directed) shall disclose no more than that portion of the Confidential Information which, on the advice of the Receiving Party's legal counsel, such Legal Order specifically requires the Receiving Party to disclose and, upon the Disclosing Party's request, shall use commercially reasonable efforts to obtain assurances from the applicable court or agency that such Confidential Information will be afforded confidential treatment.

6.    The Receiving Party shall immediately notify the Disclosing Party upon discovery of any loss or unauthorized disclosure of the Confidential Information of the Disclosing Party.

7.    Upon termination or expiration of the Agreement, or upon written request of the other Party, each Party shall promptly return to the other or destroy (and certify in writing the destruction of) all documents and other tangible materials representing the other

3.

Party's Confidential Information and all copies thereof, whether in written, electronic, or other form or media.

**8.**     Each Party recognizes and agrees that nothing contained in this Agreement shall be construed as granting any property rights, by license or otherwise, to any Confidential Information of the other Party, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on such Confidential Information.  Neither Party shall make, have made, use, or sell for any purpose any product or other item using, incorporating, or derived from any Confidential Information of the other Party.

**9.**     Each Party shall not reproduce the Confidential Information of the other Party in any form except as required to accomplish the intent of this Agreement.  Any reproduction by a Party of any Confidential Information of the other Party shall remain the property of the Disclosing Party and shall contain any and all confidential or proprietary notices or legends which appear on the original, unless otherwise authorized in writing by the other Party.

**10.**     This Agreement shall commence on the Effective Date and shall continue for a period of five (5) years following the Effective Date; provided, however, that each Party's obligations hereunder with respect to Confidential Information that constitutes "Trade Secrets" shall continue in full force and effect for so long as such information remains "Trade Secrets" under applicable law.

**11.**     This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to conflict of laws principles.  Any legal suit, action, or proceeding arising out of or related to this Agreement or the matters contemplated hereunder shall be instituted exclusively in the state courts and federal courts located in State of Georgia and city of Atlanta, and the parties hereby consent to the personal jurisdiction and venue of these courts and waive any objection based on improper venue or *forum non conveniens*.  Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court.

**12.**     Each Party acknowledges that its breach of the Agreement may cause irreparable damage to the other Party and that money damages might not be a sufficient remedy for any breach or threatened breach of this Agreement by such Party or its Representatives.  Therefore, in addition to all other remedies available at law (which neither Party waives by the exercise of any rights hereunder), each Party shall be entitled to seek specific performance and injunctive and other equitable relief as a remedy for any breach or threatened breach of this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction, and the Parties hereby waive any requirement for the securing or posting of any bond or the showing of actual monetary damages in connection with such claim.

**13.**     If any provision of this Agreement is found by a proper authority to be unenforceable or invalid, such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole and in such event, such provision shall be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or applicable court decisions.

**14.**     Neither Party shall communicate any information to the other in violation of the proprietary rights of any third party.

**15.**     Neither Party will assign or transfer any rights or obligations under this Agreement without the prior written consent of the other Party, *except that* a Party may assign the Agreement without such consent to its successor in interest by way of merger, acquisition, or sale of all or substantially all of its assets.  Any purported assignment or delegation in violation of this Section shall be null and void.  No assignment or delegation shall relieve the assigning or delegating Party of any of its obligations hereunder.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**16.**     Neither party shall export, directly or indirectly, any technical data acquired from the other pursuant to this Agreement or any product utilizing any such data to any country for which the U.S. Government or any agency thereof at the time of export requires an export license or other governmental approval without first obtaining such license or approval.

**17.**     All notices, reports, requests, consents, claims, demands, waivers, and other communications permitted or required under this Agreement shall be in writing and shall be delivered by personal delivery, electronic mail, or by certified or registered mail, return receipt requested, and shall be deemed given upon personal delivery (with written confirmation of receipt), when received by the addressee if sent by a nationally recognized overnight courier (return receipt requested), on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, or on the date sent by e-mail (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient.  Notices shall be sent to the addresses set forth at the end of this Agreement or such other address as either party may specify in writing.

**18.**     This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.  This Agreement may not be amended except by a writing signed by both parties hereto.

**19.**     This Agreement may be executed by electronic signature and in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement.  A signed copy of this Agreement delivered by e-mail or other

means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

20.    No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

*(Signatures follow.)*

**IN WITNESS WHEREOF,** the parties hereto have caused this Mutual Non-Disclosure Agreement to be executed as of the Effective Date.

**GREENLIGHT FINANCIAL TECHNOLOGY, INC.**     **NADIA ASOYAN**

By: _____     By: _____

Name: BEN SWARTWOUT

Title: DIRECTOR, PEOPLE OPERATIONS     Date: _____12/18/19_____

Date: _12/18/19_

Address: 303 Peachtree Street, NE, Suite 4300     Address: _108 Livorno Way, Redwood_
         Atlanta, GA 30308                                   _City CA 94065_

7.

EXHIBIT C



**From:** Tim Sheehan <tim@greenlight.me>
**Subject: Offer letter**
**Date:** January 15, 2020 at 12:31:25 PM EST
**To:** Nadia Asoyan <nadia.asoyan@gmail.com>

Hi Nadia, it was great to talk to you today! I'm happy your little one is doing better!! :)  As promised, attached is the offer letter. I'm looking forward to working with you! Please give me a call to discuss anything that comes up. We'd love to have you and your family visit Atlanta anytime that is convenient for you!


Talk to you soon,


Tim

# EXHIBIT D



**From:** Nadia Asoyan <nadia.asoyan@gmail.com>
**Subject: Follow up**
**Date:** March 18, 2020 at 2:43:53 PM EDT
**To:** tim@greenlight.me

Hi, Tim,

Just wanted to give you an update from my side. I really appreciate you putting time and effort on educating me about the company and its culture. I truly enjoyed meeting everyone at Greenlight and you have such an incredible team. I am also very passionate about what you do and believe it would be really successful company. However, as my husband is not able to leave his current job as he getting some opportunity locally, I will have to stay in bay area which is ultimately what is the best option for the family. I know it is tough and unprecedented time now and I hope we still keep great connection and once again it was a really pleasure to be considered for this opportunity and meet so many wonderful people.



**NELSON MULLINS**

Jeffrey Mapen
T 404.322.6157
jeff.mapen@nelsonmullins.com

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Atlantic Station
201 17th Street, NW | Suite 1700
Atlanta, GA 30363
T 404.322.6000  F 404.322.6050
nelsonmullins.com

April 23, 2020

<u>**Via FedEx and E-Mail**</u>
Ms. Nadia Asoyan
108 Livorno Way
Redwood City, CA 94065
Email: nadia.asoyan@gmail.com

      Re:    *Greenlight Financial Technology, Inc. v. Nadia Asoyan*,
             Fulton County Superior Court, State of Georgia

Dear Ms. Asoyan:

      This Firm is counsel to Greenlight Financial Technology, Inc. ("Greenlight") with respect to the lawsuit that has been filed against you in Fulton County Superior Court, State of Georgia. To the extent you retain legal counsel, please forward this to them and address all correspondence regarding this matter to the undersigned.

      Pursuant to Paragraph 11 of the Non-Disclosure Agreement executed by you on December 18, 2019, please consider this correspondence and enclosures to constitute service of process for the legal action that has been filed against you in Fulton County Superior Court in the State of Georgia. The summons and complaint are attached hereto as Exhibit A.

      As set forth in the complaint, it has recently come to Greenlight's attention that you accepted a position with Step Mobile, Inc. ("Step") as Chief Financial Officer. As you know, after execution of the Non-Disclosure Agreement in December 2019, you became privy to certain of Greenlight's confidential and proprietary business and trade secret information during your interviews and near acceptance of the Chief Financial Officer position at Greenlight.

      In direct violation of the Non-Disclosure Agreement and applicable law, Greenlight believes that you either already have used and disclosed and/or will inevitably use and disclose Greenlight's confidential and proprietary information without permission in your new role as Chief Financial Officer of Step, which is causing irreparable harm to Greenlight. As such, in addition to the complaint, Greenlight has also filed a Motion for Preliminary Injunction against you, which requests an injunction from the Court that will prohibit you from working for Step or any other direct competitor of Greenlight in the parent and child sector of the fintech industry that is a provider of parent-controlled payment cards for kids and teens, and from using or disclosing

April 23, 2020
Page 2

Greenlight's proprietary and confidential business and trade secret information, or any information derived therefrom.  A copy of Greenlight's Motion is attached hereto as Exhibit B.

Based on your knowledge of Greenlight's confidential business and trade secret information, the irreparable harm to Greenlight is incalculably immense and growing by the day. Greenlight would have sought an immediate temporary restraining order if it were not for the current COVID-19 pandemic; however, in light of the pandemic and the limited emergency Court resources, Greenlight is seeking a preliminary injunction and will endeavor to acquire a hearing date with the assigned Judge at the earliest available date.

In the interim, we urge you to immediately cease and desist from using or disclosing Greenlight's confidential and proprietary information.  Please govern yourself accordingly. Greenlight reserves all rights.

Sincerely,

Jeffrey Mapen

cc:    Mr. Tim Sheehan (via email to tim@greenlight.me)
       Mr. Johnson Cook (via email to johnson@greenlight.me)